TRICO SECURITIES CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 85176. Promulgated February 13, 1940.

*John Lord O'Brian, Esq.*, and *Ralph Ulsh, Esq.*, for the petitioner. *Allen T. Akin, Esq.*, for the respondent.

312

OPINION.

Leech: The first question is whether petitioner was formed for the purpose of avoiding the surtax on its shareholders through the medium of permitting its gains and profits to be accumulated instead of being divided or distributed.

It has been found, as a fact, that petitioner was organized as a mere holding or investment company. From this fact the presumption arises that the condemned purpose existed at its organization. Revenue Act of 1932, sec. 104 (b). However, this presumption is rebuttable and, in our judgment, has been conclusively overcome here.

The witnesses of petitioner testified that avoidance of surtax was neither discussed nor entertained as a motive by anyone concerned at the time of its organization. This testimony was neither shaken nor contradicted on cross-examination. While this testimony is certainly not conclusive as to the nonexistence of the interdicted purpose (*Reynard Corporation*, 37 B. T. A. 552, and *Rands, Inc.*, 34 B. T. A. 1094), nevertheless it is entitled to weight if there is corroborating evidence. *Cecil B. deMille Productions, Inc.*, 31 B. T. A. 1161; affd., 90 Fed. (2d) 12; certiorari denied, 302 U. S. 713; *Mellbank Corporation*, 38 B. T. A. 1108.

In our opinion, such evidence exists here. Fifty percent of the total outstanding stock of Trico, in November 1929, had been released from the restrictions of both the voting trust and the waiver of dividends. The voting trustee retained only the barest practical control of Trico and, consequently, its policies and management. But, the proscribed intent may not be inferred from an intent to concentrate and maintain control of the corporation, without more. *W. S. Farish & Co.*, 38 B. T. A. 150; affd., 104 Fed. (2d) 833. Moreover, when a block of stock was released from its restrictions, there was a danger that it would be dumped on the market, thus driving the price down or at least preventing a rise. That petitioner may have been organized for the additional purpose of avoiding any such adverse effect on the market value of Trico stock, under the present circumstances, is wholly reasonable and just as proper. Cf. *Dill Manufacturing Co.*, 39 B. T. A. 1023.

The only asset that was intended to be acquired and that was acquired by petitioner upon its organization, was this stock of Trico, which was then producing no income. Under the circumstances, in all probability, no income would arise from holding such stock and comparatively little could have been reasonably expected in the foreseeable future from such of that stock as would be released from restrictions. The intent thus evidenced, though consistent with the purpose of retaining control and protecting the market value of Trico stock, is

inconsistent with any intent to accumulate gains and profits in order to avoid surtax.

Respondent suggests that, since 1930 surtax was avoided in fact, because petitioner's dividend income in that year was used for corporate purposes, instead of being distributed, those in control of petitioner must have intended, "as keen American business men", this particular consequence. This contention is sufficiently answered by *Dill Manufacturing Co.*, supra, *C. H. Spitzner & Son, Inc.*, 37 B. T. A. 511, and *Cecil B. deMille Productions, Inc.*, supra, wherein the Board held that the prohibited purpose, upon which, alone, the imposition of the tax can depend, is not established by avoidance of surtax *per se*. Moreover, the amount of surtax avoided in 1930 by stockholders of petitioner was trivial in amount when compared with the magnitude of petitioner, the capital employed, and the risk to such capital in the operations being carried on to stabilize the market. In that year, a total amount of $7,647.44 in surtax was avoided by three of petitioner's 23 stockholders through petitioner's earnings for that year not being distributed. As to the other 20 stockholders, there is no evidence of a saving. Such a condition does not support a theory of a purpose to avoid surtax in the organization of petitioner. Common sense teaches us that it is unreasonable to assume that 21 "keen American business men" would borrow and risk some $600,000 in operations on the market to effect a saving of a tax liability of less than $8,000 to three of their number.

Accordingly, we have found that petitioner was not formed for the interdicted purpose.

Was petitioner availed of, in 1933, the taxable year, for the purpose penalized under section 104?

The reason for the creation of petitioner was to hold, in one unit, 50 percent of the stock of Trico. Admittedly, petitioner made an investment in 6,710 shares of Trico in March of 1930. But this was done in order to free such of Trico's moneys as were tied up in that treasury stock and make those funds available for production of earnings. And, the evidence is clear and overwhelming that from 1930 onward, petitioner's function was to create and support a market for Trico stock. More fully set out in our findings, it shows that, from 1930 to 1934, substantial percentages of the total volume of trading in Trico on the New York Stock Exchange were due to petitioner's market activities. In 1933, petitioner accounted for 20.1 percent of the total volume, buying 12,200 shares and selling 21,000 in 100-share lots. Expressed in dollars, the 1933 purchases totaled $357,652.50, and the 1933 sales aggregated $655,778.46. In prior years, petitioner's supporting activities were even greater, rising in 1932 to 67 percent of all market transactions in Trico. These operations un-

doubtedly stabilized the price of Trico stock and aided in lessening its decline through the course of the depression. There is no indication of trading for profit *per se*. No more than reasonable stabilization was effected. When that was accomplished, the operations ceased, the corporate debts were paid, and, thereafter, the dividends received on its remaining Trico stock were distributed.

The business reason motivating this extraordinary activity of petitioner was to prevent, as far as possible, depreciation in the market value of Trico stock. Many of the stockholders of Trico had pledged this stock as collateral on loans and margin accounts; should that collateral decline too far, their financial ruin was inevitable. Moreover, all of petitioner's capital consisted of Trico stock.

Although it must have been hoped that a profit on these protective trading transactions would be made, it is strongly indicated that their only purpose was to create and support a market for Trico stock. See *Brooklyn Trust Co., Trustee*, 31 B. T. A. 1070; affd., 80 Fed. (2d) 865; certiorari denied, 298 U. S. 659; *Investment Trust of Mutual Investment Co.*, 27 B. T. A. 1322; affd., 71 Fed. (2d) 1009. That, among those facing catastrophe were the persons responsible for petitioner's organization and market activity, or that the motives of that activity were ultimately selfish in the sense that they were for the protection of the market value of Trico stock in which many of petitioner's stockholders were not only vitally interested but upon the maintenance of which value their economic lives and that of petitioner depended, does not affect the validity of or the need for the market operations carried on by petitioner. Cf. *Dill Manufacturing Co., supra*. Such a motive is not that which the statute condemns.

However, we have made no finding as to whether petitioner was a mere holding or investment company in the taxable year 1933, because, even if it were so designated, the statutory presumption thus raised (Revenue Act of 1932, sec. 104 (b)), is, we think, conclusively overcome by the evidence.

The business need, not only for the use of all of petitioner's gains and profits but also its large borrowings in its market activities, is amply demonstrated, and contradicts the existence of the proscribed purpose. *W. S. Farish & Co., supra; Mellbank Corporation, supra*. In the years prior to 1933, petitioner had losses in its trading activities in two years and a small profit in one. In 1932 its market operations resulted in a loss. In 1933, purchases totaled $357,652.50 and sales were in the amount of $655,778.46. The income from Trico dividends in 1933 was $156,265.44. The book surplus, as of the close of 1932, was $339,735.51. This surplus was composed mainly of Trico stock acquired in the course of trading. At the beginning of 1933, petitioner owed $869,364.49 on loans which it had contracted in order

to finance its market operations. It had agreed with two banks that it would not pay dividends until it had fully repaid loans which they had made to it. Such loans were still outstanding in substantial amounts in 1933.

Faced with the necessity for reducing outstanding obligations and with a need for operating capital, the requisite amount of which could not be estimated in advance, petitioner could not reasonably have paid out anything in dividends in 1933. To have done so would not only have violated two agreements with the banks and have required a new loan, but, obviously, would have been an act of financial folly, under the circumstances. A corporation certainly need not increase its indebtedness, merely to avoid the application of section 104, when the reasonably possible consequence of such increase would be its economic injury or death. See *Dill Manufacturing Co.*, *supra*, and *Mellbank Corporation*, *supra*.

Respondent bases his argument that petitioner was availed of in 1933 for the purpose of preventing imposition of surtax on its shareholders, by his analysis of petitioner's balance sheet for that and preceding years and on certain isolated acts in prior years in which some of its then accumulated surplus was used to extend relief to some of its large stockholders in carrying Trico stock owned by them, and by purchasing and holding, for a short period, securities which they wished to sell to realize individual losses for tax purposes.

Respondent thus relies upon his analysis and reconciliation of surplus as establishing that petitioner received substantial income in each year, from 1930 to and including 1933, and that an increasing surplus existed at the close of each successive year, which amounted to $540,134.79 at the close of 1933.

Upon this basis it is urged that petitioner was well able to distribute the earnings of $213,998.89 realized in that year, the retention and use of which earnings, it is said, were not necessary in the operation of its business. As establishing the fact that a large part of such surplus was not necessary, respondent points to an item on the balance sheet for 1933, showing $100,000 represented in securities carried "for others" and $65,548.46 outstanding on loans made to two of its large stockholders. In addition to this it is contended that the balance of the existing surplus and a large part of its borrowings were merely invested in stocks and that these funds were thus accumulated in that form. It is then argued that if petitioner had surplus to invest or to loan to others it was available for dividend distribution instead.

If petitioner had no business purpose during 1933, beyond the mere purchase and holding of securities for investment, respondent's argument would undoubtedly be sound. *Rands, Inc.*, *supra*. But peti-

tioner's purpose was not so limited in 1933, nor had it been since 1930. In our opinion, the evidence is compelling that this purpose was to create and support a market for Trico stock. Having in mind that purpose and the activity of the petitioner during those years in effectuating such purpose, the conclusion is inescapable that these acts which respondent contends are consistent, only, with the intent prohibited in section 104, are, in fact, either inconsequential in the total picture or are, not only consistent with but reasonably necessary in carrying out the established purpose of creating and supporting a market in Trico stock.

Thus, the use of $100,000 in carrying Trico stock in brokerage accounts for others was as reasonable as the expenditure by petitioner of a larger sum in the purchase of such stock which would probably have been necessary had the stock been thrown on the market. The loans to two stockholders engaged in buying Trico stock and assisting in the support petitioner was giving the market, were in definite furtherance of that purpose. And, in view of the proof, we can not agree with respondent's contention that any of the Trico stock acquired and held by petitioner was a mere investment rather than a purchase made with the view of stabilizing the market and with the purpose to resell it as the market strengthened and could absorb it.

The three purchases of securities by petitioner in prior years to permit a stockholder to take a loss for income tax purposes, we think, are of no consequence here. In each instance the stock was resold at purchase price in slightly over 30 days. Both the number of such transactions and funds involved, when compared to the total trading and amounts so used, contradict any possible pertinent significance in them in this proceeding.

Petitioner entered the year 1933, engaged actively in effectuating its plan of supporting the market for Trico stock. It then had an indebtedness of $869,364.49, incurred in furnishing that support. During that year, it realized a net income of $213,998.89 and closed the year with a book surplus of $540,134.79. But, during that period, it paid $430,756.18 on account of its indebtedness. This payment was more than twice the amount of its net income for the year and, at the close of the year, its cash on hand amounted to only $19,949.11. The book surplus was represented by Trico stock bought to stabilize a weak market. Had petitioner paid a dividend at the close of 1933, it would have been forced to borrow the money to do so or, as respondent contends, sell Trico stock. The use of either such alternative was, in our judgment, impractical here. In view of then market conditions, it seems apparent that the potential needs of petitioner's business in the taxable year might reasonably require

the use of all of its credit and thus bar any use of that credit for dividend purposes. And such suggested sale of Trico stock by petitioner would have defeated the very purpose of petitioner's then existence and precipitated a condition, the result of which might well have been the elimination of profits and accumulated surplus as well. See *Delaware Terminal Corporation*, 40 B. T. A. 1180.

In addition, it may be noted that the payment of a dividend would have violated the agreements not to pay dividends, made by the petitioner with the two banks as conditions for the advancement of credits. These conditions were reasonable and were imposed on petitioner by the banks. The credits were not merely two specific loans of $300,000 each, but were two "lines of credit" in that amount. Thus, though one of the loans had been substantially curtailed by 1933, and the balance was therefore more readily payable, a violation of the agreements might well have entailed a loss of the entire lines of credit. The activities of petitioner in supporting the market were not yet ended. Such further support might reasonably have necessitated further loans.

We have therefore found as a fact that petitioner was not availed of in 1933 for the purpose of preventing imposition of the surtax on its shareholders through the medium of permitting its gains and profits to accumulate. In view of this conclusion, it is unnecessary to pass on petitioner's argument that the statute can not constitutionally apply because only some and not all of its stockholders actually avoided surtax.

Reviewed by the Board.

*Decision will be entered for the petitioner.*